1

2

3 **UNITED STATES DISTRICT COURT**

4 **NORTHERN DISTRICT OF CALIFORNIA**

5 **SAN JOSE DIVISION**

6

7 ERIC G SWALLOW,                                Case No.  17-cv-05261-BLF

8                    Plaintiff,               **ORDER GRANTING MOTIONS TO**
                                              **DISMISS WITHOUT LEAVE TO**
9          v.                                 **AMEND AND DISMISSING ACTION**
                                              **WITH PREJUDICE**
10 WILLIAM P TORNGREN, et al.,
                                              [Re:  ECF 51, 52, 53]
11                    Defendants.

12          According to Plaintiff Eric Swallow ("Eric"),[1] the disciplinary proceeding initiated by

13 California's Bureau of Gambling Control to revoke his gambling license was part of a larger

14 conspiracy.  The players in the alleged conspiracy range from the prosecuting Deputy Attorney

15 General, William Torngren ("Torngren"); to Eric's former business partners, Peter and Jeanine

16 Lunardi (individually, "Peter" and "Jeanine," and collectively, the "Lunardis"); to Eric's estranged

17 wife, Dr. Deborah Swallow ("Deborah").  Torngren, the Lunardis, and Deborah each move to

18 dismiss Eric's First Amended Complaint ("FAC"), ECF 41, which asserts claims for violations of

19 42 U.S.C. § 1983 and the Racketeer Influenced and Corrupt Organizations Act ("RICO") as well

20 as claims for tax fraud.  ECF 51, 52, 53.  For the reasons discussed below, the motions to dismiss

21 are GRANTED WITHOUT LEAVE TO AMEND and the action is DISMISSED WITH

22 PREJUDICE.

23 **I.     BACKGROUND**

24          The centerpiece of this lawsuit is Garden City, Inc. ("Garden City"), a California

25 corporation that has operated the Casino M8trix card room in San Jose, California since 1974.

26 FAC ¶ 1.  Facing financial trouble, Garden City filed for bankruptcy around 1998 but continued to

27 _____

28 [1] The Court means no disrespect to the parties by using their first names.  This nomenclature is
simply a matter of convenience due to the overlap in last names.

run its operation. *Id.* ¶ 54. The Lunardis saw an opportunity: Peter approached Eric in or around 2005 with a proposal to buy Garden City out of bankruptcy. *Id.* Eric agreed, and he and the Lunardis each purchased equal shares of Garden City stock in 2007, with Eric and Peter becoming the sole directors and officers of the company. *Id.* ¶¶ 55–57. For purposes of succession planning, Eric and the Lunardis entered into a 2008 Buy/Sell Agreement, which, among other things, provided reciprocal rights of first refusal with regard to the sale of their respective shares in Garden City. *Id.* ¶ 59.

Important here, Eric and the Lunardis secured gambling licenses to comply with the California Gambling Control Act. *Id.* ¶ 66. Two separate agencies implement the Gambling Control Act's provisions: the California Gambling Control Commission (the "Commission") and the Bureau of Gambling Control (the "Bureau"). The Commission has adjudicatory powers, including the ability to impose a penalty or discipline against an individual owner's license. *See* Cal. Bus. & Prof. Code §§ 19824–19825, 19870(a), 19871. The Bureau, which falls under the auspices of the California Attorney General's Division of Law Enforcement, performs investigatory functions and, when appropriate, initiates and prosecutes disciplinary actions against current licensees. *Id.* §§ 19826–19827.

Eric asserts that Torngren is a state actor who "used and abused his authority as a Deputy Attorney General by conspiring with the [Lunardis] to . . . cause [Eric] to lose his gambling license and force [him] to sell his interest in [Garden City] at a price far below fair market value." FAC ¶ 34. To pursue that objective, Torngren and the Lunardis allegedly recruited Eric's estranged wife, Deborah, to join the conspiracy and committed multiple acts of mail and wire fraud, bank fraud, extortion, and money laundering. *Id.* ¶¶ 34, 49. In the FAC's characterization, Torngren and the Lunardis "devised a scheme to defraud the [Commission] and commit extortion." *Id.* ¶ 36.

Things kicked off in 2013 when Torngren launched an investigation into Eric, the Lunardis, and Garden City. *Id.* ¶¶ 70, 72. Torngren sought more information about the various affiliated legal entities that Eric and the Lunardis had created to control Garden City. *Id.* ¶¶ 60–66, 72. At the beginning of May 2014, the Bureau served an accusation against Garden City,

2

which sought to revoke or suspend Eric's and the Lunardis' gambling licenses "for repeated violations of, and lack of suitability for, continued licensing under the [Gambling Control Act]." *Id.* ¶ 82. The accusation set forth the facts and specific violations supporting discipline, including that Eric and the Lunardis had provided false information to the Bureau, engaged in self-dealing to siphon off money and reduce reported income, and benefitted from illegal payments. *Id.* ¶ 83, Ex. 4. At the end of May 2014, the Bureau issued an Emergency Order that partially prevented Garden City from making payments to Eric and the Lunardis. *Id.* ¶ 94, Ex. 6. The Bureau amended the Emergency Order in June 2014 to ensure that Garden City could maintain its corporate status. *Id.* ¶ 95, Ex. 7.

By early February 2015, the Lunardis began negotiating a settlement with the Bureau. *Id.* ¶¶ 108–14. Eric alleges that these settlement communications between Torngren and the Lunardis and between Torngren, the Lunardis, and Eric were acts of mail or wire fraud in furtherance of the conspiracy. For example, Eric pleads an act of mail fraud on March 5, 2015 when the Lunardis sent a letter to Eric offering to purchase his Garden City shares in connection with a global settlement offer proposed by Torngren that obligated Eric to dispose of his shares. *Id.* ¶¶ 115–19, Ex. 10. Similarly, Eric alleges acts of mail and wire fraud based on the Lunardis' March 27, 2015 letter advising Eric that they had settled with the Bureau and their March 30, 2015 email renewing their offer to purchase Eric's shares. *Id.* ¶¶ 120–23.[2] Eric also asserts that Torngren committed wire fraud when he rejected a settlement proposed by Eric's attorney and sent a counterproposal "alleging that the gravity of [Eric] purportedly misrepresenting and omitting requested information alone justified [Eric]'s disqualification from licensure and subjected him to a hefty fine." *Id.* ¶¶ 124–25. Eric's attorney responded with confusion as to why the Lunardis were allowed to settle without losing their license while Eric was not. *Id.* ¶ 126.

Because the parties could not reach a settlement, they proceeded to an administrative hearing on the accusation. In August 2015, Administrative Law Judge ("ALJ") Mary-Margaret

---

[2] The Lunardis' settlement was later reviewed and approved by the Commission on May 14, 2015. *Id.* ¶ 127, Ex. 13. As part of the settlement, the Lunardis and Garden City admitted to certain facts and violations, agreed to certain conditions for future operations, and paid a fine of almost $2 million. *Id.*, Ex. 11.

United States District Court
Northern District of California

Anderson presided over a seven-day evidentiary proceeding during which Eric was represented by counsel. *Id.* ¶¶ 18–20, 131, 136. The FAC describes this proceeding as being "plagued with a number of irregularities orchestrated by [Torngren]." *Id.* ¶ 132. The FAC asserts instances in which Torngren promised to assist Eric's information technology contractor, Bryan Roberts ("Roberts"), with claims against Eric in exchange for Roberts's testimony and encouraged Roberts to illegally retrieve confidential information from Eric's server and emails. *Id.* ¶¶ 139–40, 153–54. The FAC further pleads that Torngren acted beyond his prosecutorial function by discussing "whether [Peter] would be able to divert [Eric]'s distributions to himself if [Eric]'s license were revoked," by agreeing with Peter's attorney to "improperly use his influence to divert [Eric]'s distributions to [Peter]," and by directing Deborah to "collect information and evidence . . . through [her] divorce proceedings." *Id.* ¶¶ 135, 166.

In December 2015, the ALJ issued a proposed decision, which revoked Eric's gambling license and denied the request for renewal. *Id.* ¶¶ 136, 142. In particular, the ALJ stated that "[t]he record is more than sufficient to support the removal of [Eric] as a . . . licensee in California" because he has shown "a lack of good character, honesty, and integrity by his violations." *Id.*, Ex. 16 at 26. In February 2016, the Commission rejected the ALJ's proposed decision. *Id.* ¶ 143, Ex. 17. The Commission also requested that the parties submit written argument on a number of specific issues. *Id.*, Ex. 17 at 1–3. After the parties did so, the Commission issued its decision in May 2016. *Id.* ¶ 144. Like the ALJ, the Commission ordered that Eric's license be revoked and that renewal be denied; the Commission also assessed a penalty and costs. *Id.*, Ex. 18 at 62. Eric filed a writ petition in July 2016 in California Superior Court seeking to vacate and set aside the Commission's decision, but that proceeding remains pending. *Id.* ¶ 145.

The revocation of Eric's license had another consequence: he was required by law to sell his shares in Garden City. *See* Cal. Bus. & Prof. Code §§ 19882(a) ("The owner of the security shall sell the security for an amount not greater than fair market value, within 60 calendar days of the . . . revocation."), 19892(b) ("The individual . . . whose license is revoked . . . shall sell his or her interest in an amount not greater than fair market value, within 60 calendar days of the . . .

revocation."). In April 2015 and again in February 2016, a third party had offered to purchase Eric's shares. FAC ¶¶ 204, 210. The FAC alleges that Torngren acted outside his prosecutorial role by engaging in numerous acts to "block [the third party]'s offer and interfere[] with [Eric]'s ability to get fair market value for his shares." *Id.* ¶ 212. Meanwhile, Eric commenced two arbitration proceedings against the Lunardis with regard to his right to sell his shares. In the first, an arbitrator concluded that the third party's $55 million offer was a bona fide offer that triggered Eric's contractual obligation under the Buy/Sell Agreement to notify the Lunardis and provide them a right of first refusal to match the third party's price. ECF 18-3, Ex. 1. That award was subsequently confirmed by the California Superior Court. *Id.*, Ex. 2. In the second arbitration, which was also confirmed by the California Superior Court, an arbitrator found that the Lunardis had properly exercised their right to buy Eric's shares, so Eric was ordered to sell his Garden City shares to the Lunardis for $55 million. *Id.*, Ex. 3–5.

After the disciplinary proceeding, Eric initiated this lawsuit in September 2017. ECF 1. He filed the operative FAC in January 2018. ECF 41. The FAC asserts six causes of action: (1) a § 1983 claim for conspiracy to commit violations of substantive due process against Torngren, the Lunardis, and Deborah; (2) a § 1983 claim for conspiracy to commit violations of equal protection against Torngren, the Lunardis, and Deborah; (3) a RICO claim against Torngren and the Lunardis; (4) a RICO conspiracy claim against Torngren, the Lunardis, and Deborah; (5) a tax fraud claim regarding Garden City's 2015 tax return against the Lunardis; and (6) a tax fraud claim regarding Garden City's 2016 tax return against the Lunardis. FAC ¶¶ 241–72. Torngren, the Lunardis, and Deborah move to dismiss the FAC in its entirety. ECF 51, 52, 53.

## II.  LEGAL STANDARD

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff. *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011).

5

However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the alleged facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## III. DISCUSSION

### A. Judicial Notice

In connection with their motion to dismiss, the Lunardis seek judicial notice of (1) final awards from two arbitration proceedings between Eric and the Lunardis and (2) orders by the California Superior Court confirming those awards. ECF 18-3 at 1–2. Eric does not contest that these documents are properly subject to judicial notice. *See* Fed. R. Evid. 201(b); *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007) ("[Courts] may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue."). Instead, Eric "objects to [the Lunardis'] request for judicial notice to the extent they invite this Court to adopt another tribunal's factual finding(s)." ECF 65 at 1. Accordingly, the Court takes judicial notice of these documents without taking judicial notice of reasonably disputed facts contained in the documents. *See Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (explaining that a court may take judicial notice of "*undisputed* matters of public record" but not "*disputed* facts stated in public records").

### B. § 1983 and RICO Claims

Eric's first four claims variously assert that Torngren, the Lunardis, and Deborah have violated § 1983 and RICO. Specifically, Eric alleges that Torngren, the Lunardis, and Deborah all engaged in conspiracy to commit violations of substantive due process and equal protection under

§ 1983 and conspiracy to commit RICO violations.  FAC ¶¶ 241–50, 259–64.  Eric separately charges Torngren and the Lunardis with RICO violations.  *Id.* ¶¶ 251–58.

The Court concludes that Torngren's challenged conduct is covered by absolute immunity and that the Lunardis' and Deborah's challenged conduct is petitioning activity protected by the *Noerr–Pennington* doctrine.  Although those rulings are sufficient to compel dismissal of Eric's § 1983 and RICO claims, the Court also briefly addresses independent bases on which Eric's claims fail.

### 1.    Absolute Immunity

Torngren asserts that he is absolutely immune from suit under § 1983 and RICO for his challenged conduct.  Claims for monetary damages against prosecutors pursuant to § 1983 and RICO may be barred by absolute prosecutorial immunity.  *Imbler v. Pachtman*, 424 U.S. 409, 430–31 (1976) (§ 1983); *Van Beek v. AG-Credit Bonus Partners*, 316 F. App'x 554, 555–56 (9th Cir. 2008) (RICO).  Although absolute immunity originally arose in the context of criminal prosecutions, the Supreme Court has extended immunity to agency officials performing functions analogous to those of a prosecutor in administrative enforcement proceedings.  *See Butz v. Economou*, 438 U.S. 478, 515 (1978).  This immunity is designed to allow officials acting in a prosecutorial role to make important discretionary decisions integral to their office without fear of retaliatory litigation for those decisions, especially where the judicial process itself already acts as a check on prosecutorial actions.  *Burns v. Reed*, 500 U.S. 478, 492 (1991).

Because absolute immunity serves a limited purpose, it is justified when "any lesser degree of immunity could impair the judicial process itself."  *Kalina v. Fletcher*, 522 U.S. 118, 127 (1997) (quoting *Malley v. Briggs*, 475 U.S. 335, 342 (1986)).  Thus, in determining whether immunity attaches, courts examine "the nature of the function performed, not the identity of the actor who performed it."  *Forrester v. White*, 484 U.S. 219, 229 (1988).  Immunity applies to conduct "intimately associated with the judicial phase of the criminal process" and protects prosecutors when they perform traditional activities as officers of the court.  *Van de Kamp v. Goldstein*, 555 U.S. 335, 342–43 (2009) (quoting *Imbler*, 424 U.S. at 430–31).  In contrast, absolute immunity does not extend to a prosecutor's "administrative duties and those investigatory

7

functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Thus, entitlement to absolute immunity for particular conduct turns on whether the prosecutor was "functioning as [an] 'advocate[]'" while engaging in that conduct. *Id.* at 274.

As a general matter, Torngren's actions were performed in his capacity as Deputy Attorney General in pursuance of the prosecution of the Bureau's accusation against Eric's license. By statute, "any power or authority of the department described in [the Gambling Control Act] may be exercised by the Attorney General or any other person as the Attorney General may delegate." Cal. Bus. & Prof. Code § 19810. The department is responsible for "perform[ing] all investigatory functions required by [the Gambling Control Act]," including "investigat[ing] suspected violations of [the Gambling Control Act] or [California laws] relating to gambling" and "initiat[ing], where appropriate, disciplinary actions." *Id.* § 19826; *see also id.* § 19827 (spelling out investigatory powers of the department). The FAC and Eric's opposition acknowledge that much of Torngren's conduct may properly be viewed as within his prosecutorial function. *See* ECF 62 at 1.

But the FAC and opposition appear to pinpoint nine acts that allegedly fall outside the prosecutorial umbrella: (1) Torngren attempted to force Eric to sell his Garden City shares to the Lunardis at below-market value; (2) Torngren authorized the Lunardis to send Eric a letter of intent to buy Eric's shares in installment payments; (3) Torngren interfered with a third party's attempt to purchase Eric's shares; (4) Torngren promised to assist Eric's IT contractor, Roberts, with software licensing claims against Eric in exchange for his testimony; (5) Torngren provided an opinion to assist Roberts in litigation efforts against Swallow; and (6) Torngren facilitated and encouraged Roberts to illegally access confidential information from Eric's server and emails; (7) Torngren had discussions with Peter and made an agreement with Peter's attorney regarding diverting Eric's shares to Peter upon revocation; (8) Torngren directed Deborah to collect information and evidence against Eric in her divorce proceedings; and (9) Torngren issued and enforced the Emergency Orders prohibiting Garden City from paying Eric his distributions. *Id.* at 1–2; FAC ¶¶ 129–30, 135, 166. Contrary to Eric's assertion, Torngren's challenged conduct was

intimately related to his advocacy function in the disciplinary proceeding. The Court examines the nine acts in turn.

First, Eric points to the allegation that at a scheduled mediation, Torngren "attempted to compel settlement of the Accusation by forcing [Eric] to sell his shares in [Garden City] and his share of the [land] to the [Lunardis] at below market, fire-sale prices." FAC ¶ 112. That act of proposing a resolution plainly qualifies for absolute immunity because it goes to the heart of what the disciplinary proceeding was designed to achieve. Indeed, in a case involving Nevada's Gaming Control Board, the Ninth Circuit granted absolute immunity where "[t]he Board initiated disciplinary proceedings against [the plaintiff] and entered into settlement negotiations with him, actions that are prosecutorial in nature." *Romano v. Bible*, 169 F.3d 1182, 1187 (9th Cir.), *cert. denied*, 528 U.S. 816 (1999). Here, too, Torngren presented Eric with an opportunity to settle the disciplinary proceeding, but Eric turned the offer down. FAC ¶ 112.

Second, Eric directs the Court's attention to the allegations that the Lunardis sent a letter of intent to purchase Eric's Garden City shares at depressed value in connection with a global settlement proposed by Torngren. *Id.* ¶¶ 115, 117. As a preliminary matter, the FAC mischaracterizes some of the facts: while the FAC says that Torngren dictated the terms of Eric's sale to the Lunardis, *id.* ¶ 117, the Lunardis' letter and accompanying email (which are attached as an exhibit to the FAC) do not support that account. *Id.*, Ex. 10. Rather, Torngren proposed a global settlement under which Eric would give up his shares in Garden City while the Lunardis would pay a small fine and renew their license, and the Lunardis acceded to the settlement. *Id.* ¶ 130. In line with that agreement, the Lunardis sent a letter of intent to purchase Eric's shares with their proposed terms of sale. *Id.*, Ex. 10. Notwithstanding the FAC's inaccurate description, as discussed above, Torngren's settlement negotiations fall within the ambit of his role as an advocate. *See Romano*, 169 F.3d at 1187.

Third, Eric identifies Torngren's actions with respect to a third party's $55 million offer to purchase Eric's shares. The FAC pleads without further explanation that Torngren exceeded his prosecutorial function by "(1) causing delay in [the third party]'s application; (2) challenging [the third party]'s offer by claiming it was in excess of Fair Market Value; and (3) interfering with [the

third party]'s purchase." FAC ¶ 212. The FAC goes on to say that "the fair market value of [Eric]'s shares was in excess of $100 million." *Id.* The problem for Eric is that revocation of his license triggered a legal obligation for him to sell his shares within 60 days for an amount not greater than fair market value. Cal. Bus. & Prof. Code §§ 19882(a), 19892(b). In this way, Torngren's actions were intended to preserve and enforce the Bureau's settlement with the Lunardis and the Commission's final revocation decision; his conduct is therefore tightly tied to the disciplinary proceeding, which remains open in light of Eric's pending writ petition in California Superior Court to vacate and set aside the Commission's decision. *Cf. Romano*, 169 F.3d at 1187 (concluding that, in "approv[ing] the stipulation entered into by [the defendant] and the Board to resolve his disciplinary proceeding," the "Commission members carried out acts of independent decision-making integral to the functioning of a quasi-judicial process"); *Demery v. Kupperman*, 735 F.2d 1139, 1144 (9th Cir. 1984) (holding that "prosecutors are absolutely immune from civil suits alleging wrongdoing with regard to post-litigation . . . handling of a case").[3] In these circumstances, the Court disagrees with Eric's contention that Torngren's acts were not performed as part of his prosecutorial function.

The fourth and fifth alleged acts are that Torngren "promis[ed] to assist [Roberts] with purported software licensing claims against [Eric]" and "provided an opinion of [Roberts's] contractual rights" in exchange for Roberts's testimony against Eric. FAC ¶¶ 139–40. However, these post-accusation acts of securing witnesses and organizing testimony for trial were part and parcel of Torngren's preparation for the disciplinary proceeding. *See Buckley*, 509 U.S. at 273 (recognizing "the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial"); *Genzler v. Longanbach*, 410 F.3d 630, 639 (9th Cir. 2005) ("A prosecutor gathering evidence is more likely to be performing a quasi-judicial advocacy function when the prosecutor is 'organiz[ing], evaluati[ng], and marshaling [that] evidence' in preparation for a pending trial, in contrast to the police-like activity of '*acquiring* evidence which might be used in a prosecution.'"

---

[3] Additionally, the third party's $55 million offer was a bona fide offer that triggered Eric's obligation under the Buy/Sell Agreement to notify the Lunardis and provide them a right of first refusal, as two arbitrations later confirmed. ECF 18-3, Exs. 1–5.

United States District Court
Northern District of California

(quoting *Barbera v. Smith*, 836 F.2d 96, 100 (2d Cir. 1987))). It does not matter if Torngren's motives were sinister and his promises were in furtherance of a larger conspiracy because "[i]ntent . . . play[s] no role in the immunity analysis." *Ashelman v. Pope*, 793 F.2d 1072, 1078 (9th Cir. 1986) (en banc). Indeed, the Ninth Circuit has observed that "allegations that a conspiracy produced a certain decision should no more pierce the actor's immunity than allegations of bad faith, personal interest or outright malevolence." *Id.* Employing that rule, the Ninth Circuit concluded that prosecutorial immunity barred a claim alleging that a prosecutor conspired with a judge to predetermine the outcome of a trial. *Id.* Prosecutorial immunity is likewise justified here.

Sixth, the FAC separately asserts that Torngren "facilitated and encouraged" Roberts to collect evidence by "illegally accessing [Eric]'s server and emails that contain privileged, confidential communications" in violation of federal and state computer trespass laws. FAC ¶¶ 153–54. But the supporting document attached to the FAC definitively contradicts those allegations. Specifically, the FAC cites an interview transcript in which San Jose's Division of Gaming Control Administrator asked Roberts to provide non-proprietary access information from a server that Roberts maintained. *Id.*, Ex. 21. Thus, even though the legality of the prosecutor's acts may be indicative or determinative of the scope of immunity, *see Lacey v. Maricopa Cty.*, 693 F.3d 896, 914 (9th Cir. 2012) (en banc) ("Where the prosecutor has side-stepped the judicial process [by disobeying applicable law], he has forfeited the protections the law offers to those who work within the process."), Torngren's actions here were not outside the bounds of the law. Instead, Torngren was performing his quasi-judicial advocacy function by marshalling evidence for the disciplinary proceeding. *See Genzler*, 410 F.3d at 639.

Seventh, Eric cites the allegation that Torngren and Peter "had discussions . . . about whether [Peter] would be able to divert [Eric]'s distributions to himself if [Eric]'s license were revoked." FAC ¶ 135. In a similar vein, before Peter testified, Torngren allegedly reached an agreement with Peter's attorney "that [Torngren] would improperly use his influence to divert [Eric]'s distributions to [Peter]." *Id.* But Torngren is easily entitled to prosecutorial immunity for discussing and preparing Peter's testimony with Peter and his attorney. *See Imbler*, 424 U.S. at

11

431 n.32 (concluding that out-of-court "effort[s] to control the presentation of [a] witness' testimony" are "task[s] fairly within [the] function as an advocate").

Eighth, the FAC alleges that Torngren contacted Deborah by phone and directed her to collect evidence through her divorce proceedings in order to build an effective case against Eric. FAC ¶¶ 162, 164–66. Although the FAC contemplates that the phone call between Torngren and Deborah took place before the Bureau served the accusation against Garden City, *id.* ¶ 162 (noting that Torngren learned of the divorce proceedings around November 2013 and called Deborah), it does not appear to suggest that Torngren was acting in an investigatory role by, for example, "searching for . . . clues and corroboration." *Buckley*, 509 U.S. at 273. Rather, the FAC states that Torngren was assembling evidence for trial: he told Deborah to "collect information and evidence [that he] was looking for her to gather and/or develop," and Deborah agreed to "provide information that would assist [Torngren] in his efforts to induce the [Commission] to revoke [Eric]'s gaming license." FAC ¶¶ 166–67. It appears that Torngren's intent was for Deborah to testify at the revocation hearing. *Id.* ¶ 187. Accordingly, Torngren's conduct was "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430.

Ninth, and finally, Eric argues that Torngren improperly "issued and enforced an Emergency Order that prohibited [Garden City] from paying Swallow his distributions as a 50% shareholder." ECF 62 at 14. It is not certain whether Torngren could be liable for issuance of the Emergency Orders given that they were signed by the Bureau's Chief and issued by the Bureau. FAC, Exs. 6–7. In any event, the department has the legal authority to "issue any emergency orders against an owner licensee . . . that the department deems reasonably necessary for the immediate preservation of the public peace, health, safety, or general welfare." Cal. Bus. & Prof. Code § 19931(a). Here, each Emergency Order "set[s] forth the grounds upon which it is based, including a statement of facts constituting the alleged emergency necessitating the action." *Id.* § 19931(b); FAC, Exs. 6–7. That conclusion is not altered by the FAC's bare allegation that Garden City's situation did not present an emergency. FAC ¶ 39. The FAC mistakenly assumes that Torngren's admission that emergency orders are typically used to shut down casinos means that emergency orders can never be used to prevent a casino from making certain payments. *Id.*

¶¶ 39–40, 90.  In fact, the statute says that an "emergency order may suspend, limit, condition, or take other action in relation to the license of one or more persons in an operation."  Cal. Bus. & Prof. Code § 19931(c).  Indeed, at the hearing before the Commission, the Chief Counsel for the Legal Division of the Commission recognized the Bureau's authority in this regard.  FAC ¶ 92 (stating that conditions "could be imposed [immediately] in an emergency order").

And Torngren had the authority to enforce the Emergency Orders against Garden City.  As a general matter, "[t]he emergency order is effective immediately upon issuance and service."  Cal. Bus. & Prof. Code § 19931(c).  Thus, when Eric's attorney asked Garden City to remit all withheld funds to Eric based on the entry of settlement between the Bureau and the Lunardis, Torngren properly responded that the settlement provided that Garden City must continue to comply with the payment restrictions in the Amended Emergency Order until there was a resolution of the accusation against Eric.  *Id.* ¶¶ 129–30, Ex. 14.  These enforcement efforts served the important purposes of protecting the Bureau's settlement with the Lunardis and preserving the status quo until the disciplinary proceeding was resolved.  *See Imbler*, 424 U.S. at 431 n.33 (explaining that "the duties of the prosecutor in his role as advocate for the State [can] involve . . . actions apart from the courtroom").  The Court views the enforcement of the Emergency Orders issued in connection with the underlying accusation as closely connected to the judicial phase of the disciplinary proceeding.  *See Van de Kamp*, 555 U.S. at 342–43.

Because absolute immunity bars Eric's § 1983 and RICO claims against Torngren, the Court GRANTS Torngren's motion to dismiss claims one through four.  "[W]here prosecutorial immunity bars a plaintiff's claim[s], the deficiencies . . . cannot be cured by amendment."  *Inman v. Anderson*, No. 17-CV-04470-LHK, 2018 WL 1071158, at *6 (N.D. Cal. Feb. 27, 2018).  Therefore, the Court dismisses these claims against Torngren without leave to amend.

### 2.    *Noerr–Pennington* **Doctrine**

Torngren's conduct is completely shielded from suit by prosecutorial immunity.  The remaining defendants—the Lunardis and Deborah—argue that their conduct is protected

petitioning activity under the *Noerr–Pennington* doctrine.[4] *Noerr–Pennington* stands for the proposition that "those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." *Sosa v. DirecTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006) (citing *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) ("*Noerr*"), and *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965) ("*Pennington*")). This doctrine arose in the context of antitrust law, *see, e.g.*, *Noerr*, 365 U.S. 127, but the Ninth Circuit has applied its protections to § 1983 and RICO actions. *See, e.g.*, *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 643–48 (9th Cir. 2009) (applying *Noerr–Pennington* in an action brought under § 1983 and RICO).

Protected petitioning activity includes bringing a lawsuit, defending a lawsuit brought by another, and filing papers with a court. *See, e.g.*, *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1184 (9th Cir. 2005) (defining petitioning activity as any "communication to the court" and concluding that *Noerr–Pennington* applies to defensive pleadings "because asking a court to deny one's opponent's petition is also a form of petition"). "[C]onduct incidental to a petition is protected by *Noerr–Pennington* if the petition itself is protected." *Id.* (internal quotation marks omitted) (quoting *Theofel v. Farey-Jones*, 359 F.3d 1066, 1078 (9th Cir. 2004)).

*Noerr–Pennington*'s protections are not absolute, however. There exists a "sham litigation" exception to the doctrine. *Id.* at 1183–84 ("While *Noerr–Pennington* immunity is broad, it is not so broad as to cover all litigation: 'Sham' petitions don't fall within the protection of the doctrine."). The Ninth Circuit has recognized three circumstances that fit the sham exception: (1) "where the lawsuit is objectively baseless and the defendant's motive in bringing it was unlawful," (2) "where the conduct involves a series of lawsuits 'brought pursuant to a policy of starting legal proceedings without regard to the merits' and for an unlawful purpose," and (3) where "'a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy.'" *Sosa*, 437 F.3d at 938 (quoting *Kottle v. Nw. Kidney Ctrs.*, 146

---

[4] Torngren also raises *Noerr–Pennington* as a ground for dismissal. Although the Court need not reach the issue because Torngren's conduct was performed as part of his prosecutorial function, the Court notes that the conclusions reached below as to the Lunardis and Deborah would apply equally to Torngren.

F.3d 1056, 1060 (9th Cir. 1998)).  Eric does not dispute that the relevant actions of the Lunardis and Deborah fall within the scope of the *Noerr–Pennington* doctrine; instead, he invokes the third formulation of the sham exception, arguing that fraud and intentional misrepresentations deprived the disciplinary proceeding of its legitimacy.

The Court finds that this exception is inapplicable because the FAC and supporting exhibits conclusively show that Eric's identified issues did not deprive the disciplinary proceeding of its legitimacy.  Starting at the high level, the Court notes that the proceeding lasted seven days before an ALJ during which Eric was permitted to submit evidence and make arguments in support of his case.  FAC ¶¶ 131, 136.  Afterward, the ALJ issued an extensive proposed decision detailing the reasons for revoking Eric's gambling license and denying his request for renewal. *Id.*, Ex. 16.  The ALJ's review was followed by a second-layer review by the Commission.  Not completely satisfied some of with the ALJ's findings, the Commission rejected the ALJ's proposed decision and requested that the parties submit written argument on a number of specific issues, *id.*, Ex. 17 at 1–3, which the parties did.  In a thorough 62-page decision, the Commission explained its reasons for ordering that Eric's license be revoked, ordering that renewal be denied, and assessing a penalty and costs against Eric.  *Id.*, Ex. 18.  It is important to note that throughout the entirety of the proceedings before the ALJ and the Commission, Eric was represented by an attorney.  *Id.* ¶¶ 18–20.  Furthermore, Eric has challenged the Commission's decision in a writ petition that is still pending before the California Superior Court.  *Id.* ¶ 145.

Turning to the specifics, the Court concludes that Eric cannot show that any of the alleged irregularities in the proceeding had any influence on the underlying decision.  *See Rupert v. Bond*, 68 F. Supp. 3d 1142, 1159 (N.D. Cal. 2014).  Eric first pleads that Deputy Attorney General Ronald Diedrich ("Diedrich") made an unexpected appearance on the first day of the hearing. FAC ¶ 132.  The ALJ acknowledged Diedrich's presence (in part because the ALJ had previously worked for him) and asked Torngren to explain his role.  *Id.* ¶ 134.  As reflected in the transcript from the proceeding, Torngren responded: "[Diedrich] and I are coworkers.  Because of his wealth of experience in administrative law matters, he's here to provide some assistance today."  *Id.*, Ex. 15 at 48.  The ALJ also gave Eric's attorney an opportunity to be heard on the issue, but counsel

declined. *Id.* Outside of these acknowledgements of Diedrich's presence, *id.* ¶¶ 132–34, the Court has not found or been pointed to any point at which Diedrich played any role in the proceeding. Nor does the ALJ's decision reference Diedrich. Even if the Court were to agree that Diedrich's presence was inappropriate, it had no demonstrated effect on the proceeding or final decision, as required to invoke the pertinent sham exception. *See Rupert*, 68 F. Supp. 3d at 1159.

Next, Eric looks to the testimony and evidence submitted with respect to three witnesses— Peter, Roberts, and Deborah—which the Court addresses successively. With respect to Peter, the FAC challenges the veracity of his testimony when he admitted, during the course of that testimony, that he had had discussions with Torngren about whether Peter would profit if Eric's license were revoked. FAC ¶ 135. The FAC describes the ALJ as finding that "[Peter]'s testimony against [Eric] was 'evasive and disingenuous' and that [Peter] was effectively trying to find a way to divert millions of dollars in [Eric]'s distributions to himself." *Id.* ¶ 136. But the fact that Peter's motives were revealed and that the ALJ accordingly discounted his testimony demonstrate that the process was working, not that it was defective. Indeed, the ALJ's decision explicitly noted that "[Peter]'s testimony was accorded less weight because of his self-interest in the proceedings." *Id.*, Ex. 16 at 4. The Commission repeated the same observation about Peter's diminished credibility and relied on his testimony only when "supported by documentary evidence and other witnesses." *Id.*, Ex. 18 at 11–12.

The same is true with respect to Roberts's testimony. The FAC says that Torngren "directly coerced and influenced the testimony of [Roberts]." *Id.* ¶ 146. In particular, the FAC alleges that, in exchange for Roberts's cooperation, the Lunardis promised to pay Roberts for IT work at Garden City and Torngren promised to help Roberts pursue licensing claims against Eric. *Id.* ¶¶ 138–40. But the methods used to acquire Roberts's declaration were raised during the hearing. Accordingly, the ALJ "accorded no weight" to Roberts's declaration based on her finding that "Roberts's statement was essentially purchased by the Bureau with [Peter]'s assistance." *Id.* ¶ 137, Ex. 16 at 4. In deciding not to adopt the ALJ's proposed decision, the Commission specifically asked the parties to address the weight that it should give to Roberts's declaration. *Id.*, Ex. 17 at 3. Based on the parties' responses and the evidence, the Commission

disagreed that "Roberts's testimony was coerced or that he was forced to say anything he did not wish to say." *Id.*, Ex. 18 at 11. The Commission therefore considered Roberts's declaration "as part of the record but afforded less weight in making [its] factual findings." *Id.* Again, these circumstances typify the orderly progression of a legitimate process.

Relatedly, the Court rejects Eric's unsupported assertion that Torngren "deliberately withheld [certain] discovery and repeatedly misled the ALJ about its existence." *Id.* ¶ 151. In particular, the FAC states that "[Torngren] withheld hundreds of e-mails between himself and [Roberts] and hundreds of additional e-mails between himself, [Peter], [Roberts], [Peter's attorney] and others acting as [the Lunardis'] agents." *Id.* But as the FAC admits, Torngren's privilege log submitted in the pending writ proceeding in California Superior Court lists these emails and provides the grounds on which the documents were withheld—e.g., attorney work product privilege. *Id.*, Ex. 20. Eric does not particularly challenge any withholding decision or privilege designation. The FAC suggests that these emails would have mattered because they would have served to show that Torngren was responsible for coercing Roberts's testimony. *Id.* ¶¶ 148–50.[5] Even putting aside that the supporting evidence does not support that narrative, *see id.*, Ex. 19, Eric does not allege that Roberts said anything untruthful in the disciplinary hearing, and neither the ALJ nor the Commission placed much weight on Roberts's testimony in reaching their decisions.

As to Deborah, Eric alleges that she made untrue statements regarding her participation and interest in a business called Secure Stone, LLC ("Secure Stone"). *Id.* ¶¶ 168–69. Specifically, the FAC states that Deborah falsely testified under oath that Secure Stone was community property, not her sole property; that she never saw or received from Eric checks made out to Secure Stone; and that she never deposited checks made out to Secure Stone. *Id.* ¶ 168. According to the FAC, Deborah later recanted this testimony and refused to testify at the

---

[5] The FAC also repeats the allegation that Torngren encouraged Roberts to secure Eric's confidential information by illegal means. *Id.* ¶¶ 148, 153–54. Not only does Eric fail to identify any confidential information that was illegally taken from him or introduced during the proceeding, but his story is contradicted by the interview transcript attached to his FAC. As noted above, Roberts was asked to provide non-proprietary information from a server that Roberts maintained. *Id.*, Ex. 21.

disciplinary hearing. *Id.* ¶¶ 185–87. Although it appears that the ALJ and the Commission may have relied on Deborah's representation that Secure Stone was community property, *see id.*, Ex. 16 at 7, Ex. 18 at 16, the proceeding was not deprived of its legitimacy. For one thing, Eric knew of the alleged errors in her testimony and had an opportunity to bring up any perceived falsities during the disciplinary proceeding. *Alers v. Bank of Am., NA*, No. 14-CV-00611-GW, 2014 WL 12787629, at *2 (C.D. Cal. Apr. 24, 2014), *aff'd*, 671 F. App'x 425 (9th Cir. 2016). Additionally, the ALJ and the Commission both found that "the record [was] replete with credible evidence that Secure Stone was operated and controlled by [Eric], including his testimony that he considered it his company." *Id.*, Ex. 16 at 7, Ex. 18 at 16. Most importantly, however, it is a certainty that there was no ultimate effect on the Commission's decision because the Commission concluded that, as a legal matter, "the charges regarding [Secure Stone] were not proven." *Id.* ¶ 191. Eric's opposition essentially concedes that Deborah's statements about Secure Stone had no bearing on the Commission's decision but urges the Court to "consider her misrepresentations in the context of the entire conspiracy." ECF 64 at 21. However, because the Court has already rejected Eric's other challenges, there is no basis to conclude that the disciplinary proceeding was a sham.

In sum, to the extent that the irregularities identified by Eric were actually irregular, none of them so deprived the disciplinary proceeding of its legitimacy as to render it a sham. In large part, the alleged misrepresentations "were clearly not relied upon by [the decisionmakers]." *Rupert*, 68 F. Supp. 3d at 1159. Additionally, Eric improperly seeks to rehash arguments already addressed by the ALJ and the Commission or to "recast disputed issues from the underlying litigation as 'misrepresentations' by the other party." *Kottle*, 146 F.3d at 1063 (citation omitted). These efforts "are therefore insufficient to overcome *Noerr–Pennington* protection." *Id.* at 1064 (citation omitted). Accordingly, the Court concludes that the conduct of the Lunardis and Deborah is petitioning activity entitled to immunity under the *Noerr–Pennington* doctrine and GRANTS their motions to dismiss claims one through four. Because there does not appear to be any way in which Eric could amend the FAC, consistent with his present allegations, to overcome the *Noerr–Pennington* doctrine, the Court dismisses these claims without leave to amend.

### 3.     Alternative Bases for Dismissal

The Court also briefly addresses other grounds raised by Torngren, the Lunardis, and Deboarah, many of which supply legitimate alternative bases on which to dismiss Eric's § 1983 and RICO claims.

#### a.     Claim and Issue Preclusion

The Lunardis and Deborah assert that the prior two rounds of arbitration between Eric and the Lunardis bar Eric's § 1983 and RICO claims under the doctrines of claim and issue preclusion. Claim and issue preclusion are related doctrines that involve the "effects of former adjudication." 18 Charles Alan Wright et al., Federal Practice and Procedure § 4402 (3d ed. 2018). Claim preclusion "operates as a bar to the maintenance of a second suit between the same parties on the same cause of action." *People v. Barragan*, 83 P.3d 480, 492 (Cal. 2004). Issue preclusion "prohibits the relitigation of issues argued and decided in a previous case, even if the second suit raises different causes of action." *DKN Holdings LLC v. Faerber*, 352 P.3d 378, 386 (Cal. 2015). The Court examines each of these doctrines in turn.

Claim preclusion has no application in this case. "Claim preclusion arises if a second suit involves: (1) the same cause of action (2) between the same parties (3) after a final judgment on the merits in the first suit." *Id.* Although elements (2) and (3) are satisfied for the Lunardis, element (1) is not. To distinguish between causes of action, California employs the primary rights doctrine, which focuses on the harm suffered. *San Diego Police Officers' Ass'n v. San Diego City Emps.' Ret. Sys.*, 568 F.3d 725, 734 (9th Cir. 2009). While the prior arbitration actions dealt with the Lunardis' right of first refusal under the Buy/Sell Agreement, Eric's present action alleges deprivation of his civil rights under § 1983 and violations of RICO. The rights protected by those federal statutes are distinct from the common law right to enforce only agreed-upon contractual terms, the claim presented in arbitration. *See Ivanoff v. Bank of Am., N.A.*, 215 Cal. Rptr. 3d 442, 451 (Ct. App. 2017) (concluding that a violation of a federal statutory consumer protection statute triggered a different primary right than a contract claim). It is not even clear if these issues could have been raised in arbitration, and claim preclusion extends only to those claims that actually

were or could have been litigated previously. *Ass'n of Irritated Residents v. Dep't of Conservation*, 218 Cal. Rptr. 3d 517, 531 n.14 (Ct. App. 2017).

In contrast, issue preclusion prevents Eric from relitigating issues regarding the sale of his shares in Garden City. At multiple points, the FAC bleeds into this territory when it asserts that the Lunardis impeded Eric's sale to a third party and required Eric to sell his shares to the Lunardis at below-market prices. *See, e.g.*, FAC ¶¶ 34–36, 59, 79. Those assertions appear to be at odds with the arbitrators' findings that the third party's offer to purchase Eric's Garden City shares for $55 million was a bona fide offer that triggered the Lunardis' right of first refusal to purchase the shares at the same price. ECF 18-3, Exs. 1, 3. And the arbitration decisions became binding when they were confirmed by the Superior Court. *See* Cal. Civ. Proc. Code §§ 1908(a)(2), 1287.4. Eric cannot reopen these settled issues. Such "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment" is exactly what issue preclusion is designed to avoid. *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748–49 (2001)). Eric appears to acknowledge this point, as he "agrees that the arbitration decisions are final and dispositive as to whether the Lunardis could exercise their right of first refusal . . . and match [the third party's] $55 million offer and the terms of that specific sale." ECF 63 at 8. Thus, the Court concludes that Eric's claims are barred by issue preclusion to the extent they seek to revisit the arbitrators' determinations about the sale of Eric's Garden City shares.

### b. Failure to State a § 1983 Claim

Eric cannot state a cognizable claim under § 1983 against any of the defendants. Section 1983 provides a tort remedy against "[e]very person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Eric's two § 1983 claims allege that Torngren, the Lunardis, and Deborah conspired to deprive Eric of his constitutional rights to substantive due process and equal protection. FAC ¶¶ 241–50.

Conspiracy under § 1983 is typically deployed by plaintiffs as a means to "draw in private parties who would otherwise not be susceptible to a § 1983 action because of the state action

20

doctrine." *Lacey*, 693 F.3d at 935 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970)). Private parties may still be liable even if the state actor is shielded from suit by some form of immunity. *See Dennis v. Sparks*, 449 U.S. 24, 28 (1980). Nevertheless, conspiracy is not itself a constitutional tort under § 1983. *Lacey*, 693 F.3d at 935. Thus, the plaintiff must always show "an underlying constitutional violation" to sustain a § 1983 claim. *Id.* Eric cannot do that here.[6]

Eric's substantive due process rights have not been violated. The substantive due process guarantee protects against the arbitrary and oppressive wielding of government power. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). Government conduct violates substantive due process when it is so severe as to "shock[] the conscious." *United States v. Salerno*, 481 U.S. 739, 746 (1987) (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952)). None of the conduct that Eric challenges can fairly be characterized as rising to that level. Rather, based on Eric's behavior as a gambling establishment owner, Torngren initiated and prosecuted an action to revoke Eric's license. The Lunardis and Deborah participated in that action either by collecting evidence or providing testimony. After a seven-day administrative hearing, the ALJ and the Commission decided that revocation was appropriate. Accordingly, Eric cannot make out a claim for violation of his substantive due process rights.

The same result obtains with respect to Eric's class-of-one equal protection claim. The Supreme Court has held that a "class of one" may sustain an equal protection claim by alleging that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Assuming that Eric can rely on the class-of-one theory, his equal protection claim fails because there is a rational basis for the difference in treatment. In particular, the Bureau's and Commission's various decisions detail Eric's egregious and unlawful conduct that warranted issuing Emergency Orders and revoking his license. FAC, Exs. 4, 6–9, 18. In response, the FAC asserts, with no further elaboration, that Eric was "treated differently than others similarly situated

United States District Court
Northern District of California

---

[6] Eric relatedly has not shown "the existence of an agreement or meeting of the minds" between Torngren, the Lunardis, and Deborah "to violate constitutional rights." *Crowe v. Cty. of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010) (citation omitted).

21

and there is no rational basis for the difference in treatment." *Id.* ¶ 248. The only possible

comparator is Peter, but the FAC admits that Torngren and the Commission offered an explanation

for his disparate treatment—namely, Peter was an "absentee owner." *Id.* ¶¶ 198–99. As the

Commission stated in its decision, "the record established clearly that [Eric] was far more culpable

than [Peter] which justifies disparate treatment." *Id.*, Ex. 18 at 58.[7] Therefore, Eric cannot make

out a claim for violation of his equal protection rights.

### c.    Failure to State a RICO Claim

Eric's two RICO claims also fail. Eric brings a RICO claim against Torngren and the

Lunardis for violations of 18 U.S.C. § 1962(c), which provides that "[i]t shall be unlawful for any

person employed by or associated with any enterprise engaged in, or the activities of which affect,

interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of

such enterprise's affairs through a pattern of racketeering activity." FAC ¶¶ 251–58. Eric's

second RICO claim includes Deborah as a defendant in addition to Torngren and the Lunardis.

The FAC alleges a § 1962(d) violation for conspiracy to violate § 1962(c). FAC ¶¶ 259–64.

Eric has not established the contemplated or actual existence of a "pattern of racketeering

activity," which is necessary for his two RICO claims. *Religious Tech. Ctr. v. Wollersheim*, 971

F.2d 364, 368 n.8 (9th Cir. 1992) (per curiam). A "pattern of racketeering activity" requires

commission of at least two enumerated predicate offenses within a ten-year period. 18 U.S.C.

§ 1961(1), (5). As predicate offenses, Eric has alleged mail and wire fraud, bank fraud, extortion,

and money laundering. FAC ¶ 49. The Supreme Court, however, has made clear that in addition

to the requisite number of predicate acts, the plaintiff must show that the predicates are related and

"amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492

U.S. 229, 239 (1989). The latter concept, "continuity," refers "either to a closed period of

---

[7] In his opposition, Eric also suggests that Torngren defied the Commission's decision, which Eric characterizes as "requiring the Lunardis to disburse Plaintiff's income to him as a 50% shareholder in a [sic] 'S' corporation." ECF 62 at 18. But the cited portion of the decision provides only that "[California Business and Professions Code] [s]ection 19882 controls any denial or revocation of license for a shareholder in a corporation. [Peter did] not stand to receive any withheld distributions and [Eric]'s shares would be subject to sale; not automatic transfer to remaining shareholders." FAC, Ex. 18 at 11 n.6.

1    repeated conduct, or to past conduct that by its nature projects into the future with a threat of

2    repetition." *Id.* at 241.

3           Eric obviously cannot demonstrate a future threat because the alleged RICO scheme ceases

4    once the prosecution is complete. *See Wollersheim*, 971 F.2d at 366 ("Since the only goal . . . was

5    the successful prosecution of the . . . state tort suit, there was no threat of activity continuing

6    beyond the conclusion of that suit."). Nor can Eric establish a closed period of continued criminal

7    activity. The Ninth Circuit has found that a plaintiff fails to allege a "pattern of racketeering

8    activity" when the defendant's "collective conduct is in a sense a single episode having the

9    singular purpose of impoverishing [the sole plaintiff]." *Sever v. Alaska Pulp Corp.*, 978 F.2d

10   1529, 1535 (9th Cir. 1992) (citing *Medallion Television Enters., Inc. v. SelecTV of Cal., Inc.*, 833

11   F.2d 1360, 1364 (9th Cir. 1987)). The instant case fits that bill: the alleged RICO scheme was

12   designed to achieve one "common goal, i.e., to cause [Eric] to lose his gambling license and force

13   [him] to sell his interest in [Garden City] at a price far below fair market value." FAC ¶ 34. Other

14   circuits have reached the same conclusion on similar facts to those here. *See, e.g.*, *Jackson v.*

15   *BellSouth Telecomms.*, 372 F.3d 1250, 1267 (11th Cir. 2004) ("[W]here the RICO allegations

16   concern only a single scheme with a discrete goal, the courts have refused to find a closed-ended

17   pattern of racketeering even when the scheme took place over longer [than ninth months].");

18   *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir. 1995)

19   (noting that it is "virtually impossible" to show a pattern of racketeering activity for a "single

20   scheme" with a "single injury" and "few victims"); *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507,

21   1516 (10th Cir. 1990) (holding that multiple predicate acts failed to show a pattern where the acts

22   "constituted a single scheme to accomplish 'one discrete goal,' directed at one individual with no

23   potential to extend to other persons"). Accordingly, Eric's RICO claims are also doomed.

24          **C.      Tax Fraud Claims**

25          Eric's final two causes of action charge the Lunardis with willfully filing fraudulent

26   information returns with the Internal Revenue Service for the 2015 and 2016 calendar years. FAC

27   ¶¶ 265–72. Specifically, the FAC states that the Lunardis earned more than was reported on

28   Garden City's 2015 and 2016 returns and paid Eric less than the amount reported in the returns

                                                    23

(and less than he was entitled). *Id.* ¶¶ 266, 270. Eric invokes 26 U.S.C. § 7434(a), which provides that "[i]f any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return."

Eric has sued the wrong "person" under § 7434(a). That statutory section provides a cause of action against the person who files the allegedly fraudulent return. And under the Internal Revenue Code, the term "person" encompasses companies and corporations. *See* 26 U.S.C. § 7701(a)(1) ("The term 'person' shall be construed to mean and include an individual, a trust, estate, partnership, association, company or corporation."). Here, as the FAC itself makes plain, Garden City is the "person" who filed the allegedly fraudulent returns. Indeed, the FAC explains that the two causes of action are based on Garden City's submissions of "U.S. Income Tax Return[s] for an S Corporation" for the 2015 and 2016 calendar years. FAC ¶¶ 266, 270. At least one other district court has held that the taxpayer, not the preparers of the return, is liable under § 7434(a), *see Vandenheede v. Vecchio*, No. 12-CV-12284-GCS, 2013 WL 692876, at *3 (E.D. Mich. Feb. 26, 2013), *aff'd*, 541 F. App'x 577 (6th Cir. 2013), and Eric provides no authority to the contrary. Accordingly, because Eric cannot maintain his tax fraud claims under § 7434(a) against the Lunardis as a matter of law, the Court dismisses claims five and six without leave to amend.

## IV.    ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that Torngren's, the Lunardis', and Deborah's motions to dismiss are GRANTED WITHOUT LEAVE TO AMEND and the action is hereby DISMISSED WITH PREJUDICE.


Dated: May 14, 2018

BETH LABSON FREEMAN
United States District Judge